**TRITON COAL COMPANY, a Delaware Corporation, Appellant (Defendant),**

v.

**HUSMAN, INC., a Wyoming Corporation and Debtor-in-Possession, Appellee (Plaintiff).**

**HUSMAN, INC., a Wyoming Corporation and Debtor–in–Possession, Appellant (Plaintiff),**

v.

**TRITON COAL COMPANY, a Delaware Corporation, Appellee (Defendant).**

Nos. 92–55, 92–56.

Supreme Court of Wyoming.

Feb. 3, 1993.

Rehearing Denied Feb. 24, 1993.

Motion to Vacate Mandate of Reversal Denied (in part) March 16, 1993.

Patrick R. Day, Donald I. Schultz, and Mary J. Chinnock of Holland & Hart, Cheyenne, for Triton Coal Co.

Lawrence A. Yonkee and Lynne A. Collins of Yonkee & Toner, Sheridan, for Husman, Inc.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT, and GOLDEN, JJ.

MACY, Chief Justice.

Triton Coal Company appeals from a special verdict granting breach-of-contract damages to Husman, Inc., in part, because Triton failed to fully pay Husman for its removal of overburden and topsoil from Triton's coal mine.

We affirm in part, reverse in part, and remand.

Triton raises the following issues on appeal:

1. Did the District Court exceed its jurisdiction by submitting breach of contract claims to the jury which were not appealed by Husman and therefore beyond the scope of the issues identified in this Court's Order on Remand following the first appeal?

2. Did the District Court err by refusing to grant Triton's Motions for a Directed Verdict or for a J.N.O.V. on the only breach of contract issue properly preserved by Husman following the initial appeal?

3. Assuming the breach of contract claims were properly preserved following the initial appeal, did the Plaintiff prove any damages with the requisite degree of certainty required by Wyoming law?

4. Assuming the breach of contract claims were properly preserved following the initial appeal, did the District Court err in its instructions regarding those claims by failing to define the claims sufficiently to avoid juror confusion and the possibility of a double recovery by the Plaintiff?

5. Did the District Court err by denying Triton's Motion for a Directed Verdict on the tort claims since the wet site conditions were visible and therefore the contractor's responsibility as a matter of law?

This case was previously before us in *Husman, Inc. v. Triton Coal Company,* 809 P.2d 796 (Wyo.1991). To properly address the issues in this second appeal, it is necessary to examine in some detail the procedural history of the first case. In April 1988, Husman contracted with Triton to remove topsoil and overburden from Triton's coal mine located near Gillette, Wyoming. Husman made its bid to remove the overburden and topsoil under the impression that the job would be a "dry dirt job." After it began working, however, Husman encountered overburden and topsoil saturated with moisture which made removal significantly more difficult than it originally anticipated. Despite the high moisture content, Husman continued to perform under the contract and even agreed to remove overburden beyond the amount to which the parties initially agreed. On October 1, 1988, Triton finally terminated the contract, opting to have a different contractor proceed with the removal. A dispute arose between Triton and Husman after Husman submitted its final invoice for the material it removed. Husman claimed that Triton owed a total of $246,551.72, which included $181,801.25 for the material removed as well as $64,750.47 for retainage. Husman based its invoice total upon its "load count"; i.e., the number of truckloads of dirt it removed. In a November 9, 1988, letter, Triton claimed that it owed only $12,165.60 to Husman. Triton arrived at the lower figure by deducting almost $191,000 in overpayments as evidenced by a final survey of the actual material removed, $40,000 in penalties for removing

less than the contract's required minimum in the months of August and September, as well as approximately $3,500 for spare parts. Husman subsequently brought suit against Triton.

In its amended complaint, Husman claimed that Triton breached the parties' contract by failing to disclose the water-saturated condition of the topsoil and over-burden, that Triton breached the contract by failing to pay $246,551.72 for the material removed, that Triton intentionally misrepresented the subsoil conditions, that Triton negligently misrepresented the subsoil conditions, and, finally, that Triton breached the contract's implied covenant of good faith and fair dealing. Triton moved for, and the lower court granted, a summary judgment on all five issues, although the court did award $33,525.34 to Husman for retainage. Husman appealed from the summary judgment entered against it, claiming that genuine issues of material fact existed concerning the tort claims and the claim for breach of an implied covenant of fair dealing. Of particular significance to the current appeal is the fact that Husman did not identify as error the summary judgment entered against it on Count II, its claim that Triton failed to pay $246,551.72 for the material removed.

In *Husman, Inc.*, this Court reversed the trial court's decision and remanded the case after finding that genuine issues of material fact existed concerning Husman's claims of fraud, negligent misrepresentation, and breach of the covenant of good faith and fair dealing. 809 P.2d 796. On remand, the lower court permitted Husman to try not only its tort claims and claim for a breach of the implied covenant of good faith and fair dealing but also Count II, the breach-of-contract claim for the material removed for which Triton did not pay. In a pretrial motion, Triton objected to trying Count II because the issue had been disposed of by the trial court's grant of a summary judgment and by Husman's failure to raise the issue on appeal. The trial judge denied Triton's motion, construing our opinion in *Husman, Inc.* as requiring him to try the whole case, including the issue of whether Husman had been paid for

the full volume of material it removed. In a special verdict, the jury awarded $336,-117.23 in damages to Husman for Triton's breach of the contract and $131,264.50 for Triton's negligent misrepresentation of the site conditions.

The central question raised by Triton in this second appeal is whether the lower court's initial grant of a summary judgment against Husman on all issues and Husman's failure to raise some of those issues on appeal, including Count II, meant that Husman was foreclosed from pursuing Count II in a subsequent trial even though this Court reversed the summary judgment on the issues which were appealed. To support its position that Husman was foreclosed from pursuing Count II, Triton argues that Husman's failure to appeal the summary judgment against it on that issue meant the lower court's judgment became the "law of the case" and that Husman's failure to appeal Count II rendered the trial court's summary judgment final pursuant to the doctrine of waiver. Although waiver and the "law of the case" are generally quite distinct doctrines, in the unique posture of this case we perceive them to have essentially the same underlying rationale and agree with Triton that Husman's failure to appeal Count II foreclosed a trial on that issue upon remand. Because the thrust of Triton's argument relates to the "law of the case," it is helpful to briefly explain the doctrine and why we think that the "law of the case" as applied in this type of case is simply an example of waiver.

■ Under the "law of the case" doctrine, a court's decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation. 1B JAMES W. MOORE, JO DESHA LUCAS & THOMAS S. CURRIER, MOORE'S FEDERAL PRACTICE ¶ 0.404[1] (2d ed. 1983). The "law of the case" is a doctrine designed to avoid repetitious litigation and to promote consistent decision making. As such, it is in the same family as res judicata, collateral estoppel, and stare decisis. In their treatise, Professors Wright, Miller, and Cooper identify four situations in which the "law of the

case" may arise. 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 (1981). Most commonly, the "law of the case" requires a trial court to adhere to its own prior rulings, adhere to the rulings of an appellate court, or adhere to another judge's rulings in the same case or a closely related case. *Id.* Triton, however, relies upon a fourth and much less utilized aspect of the rule in which a court's ruling on an issue that could have been appealed, but was not, will be given preclusive effect. *Tom Beuchler Construction, Inc. v. City of Williston,* 413 N.W.2d 336, 339 (N.D. 1987). Although some courts label this fourth category as the "law of the case," it is something of a misfit. Generally, the "law of the case" arises because a court has ruled on a matter and that ruling is to be applied to subsequent proceedings in the litigation. However, in the fourth category relied upon by Triton, it is the litigant's failure to raise an issue on appeal which gives rise to the preclusive effect of the lower court's ruling, not a court ruling. Allan D. Vestal, *Law of the Case: Single-Suit Preclusion,* 11 UTAH L.REV. 1 (1967). The underlying rationale of the fourth category of the "law of the case" is that a litigant can argue to an appellate court only those issues which he raised on appeal. *Id.* at 21. The idea that a litigant is limited to arguing those issues he raised on appeal is, in essence, the concept of waiver.

The general rule concerning waiver is: [Q]uestions assigned as error are deemed to have been abandoned or waived where they are not urged or discussed on appeal by brief or argument, or are not sufficiently so discussed; and the same rule applies to cross errors.

5B C.J.S. *Appeal and Error* § 1803 at 98 (1958). This Court has consistently applied this long-standing rule in prior cases.

*Dworkin v. L.F.P., Inc.,* 839 P.2d 903 (Wyo.1992); *Schaffer v. Standard Timber Company,* 79 Wyo. 137, 331 P.2d 611 (1958). In the present case, the district court entered a summary judgment finally disposing of Count II of Husman's complaint. When Husman failed to raise or discuss the issue on appeal, the issue was waived or abandoned.

Husman argues that the doctrine of waiver is inapplicable in this case because our reversal in the first appeal meant that, on remand, the district court was free to follow any procedure and retry any issues which this Court had not ruled upon, including Count II.[1] Husman relies upon the general rule as stated in 5B C.J.S. *Appeal and Error, supra,* § 1950 at 511, to support its claim:

The effect of a general and unqualified reversal of a judgment, order, or decree is to nullify it completely and to leave the case standing as if such judgment, order, or decree had never been rendered, except in so far as rights to a new trial or further proceedings may survive.

We agree with the rule cited by Husman and repeated by a large number of jurisdictions around the country. *See, e.g., Shilts v. Young,* 643 P.2d 686 (Alaska 1981). However, we must disagree with Husman's claim that such a rule meant that our reversal in the first appeal necessarily granted the district court jurisdiction to try Count II in this case. Triton argues forcefully that, if adopted, Husman's interpretation of a reversal's effect would potentially wreak havoc on appellate practice in cases involving multiple, separate issues. Take, for example, a situation in which the district court grants a summary judgment on three separate issues and the losing party has a strong argument that material issues of fact exist concerning one issue but not

---

1. At oral argument, Husman also argued that waiver is not appropriate in cases decided by summary judgment. We see no reason why courts should not apply waiver in the summary-judgment context. *See Dworkin,* 839 P.2d 903. We realize that other courts have said that the "law of the case" does not apply when a summary judgment is reversed because material issues of fact exist. *Poyzer v. Amenia Seed and* *Grain Company,* 409 N.W.2d 107, 109 (N.D. 1987); *Borkus v. Michigan National Bank,* 324 N.W.2d 123 (Mich.Ct.App.1982). Those decisions are appropriate because the "law of the case" should not apply to a case which has not been decided on its merits. However, as already discussed, this is not a traditional "law of the case" situation and is essentially a waiver case.

the other two issues. If a reversal had the effect contemplated by Husman, the losing party would be inclined to appeal the one issue because it would be reversed on appeal but would not appeal the remaining two issues because they would be impliedly reversed along with the sure winner. The foregoing scenario creates the bizarre result of placing an appellant who does *not* appeal certain issues in a superior position to one who does and forces the winning party below to cross-appeal on issues he had won just to ensure that those issues would not be impliedly reversed.

As the foregoing situation demonstrates, a reversal in a case such as that hypothesized should not have the far-reaching effect which Husman advocates. To give credence to the general reversal rule relied upon by Husman and to also accommodate the need for finality when distinct issues are not appealed, we hold that an appellate court's reversal must affect only those portions of the judgment from which an appeal is actually taken. Although we have not found a large number of cases dealing with this question, other courts have taken a similar position. According to the court in *Vorrath v. Garrelts*, 49 Mich.App. 142, 211 N.W.2d 536, 538 (1973): "The general rule appears to be that only the portion of a judgment that is appealed from is held for naught by a reversal." *Lang v. Federated Department Stores, Inc.*, 161 Ga.App. 760, 287 S.E.2d 729, 732 (1982); *Calistro v. Spokane Valley Irrigation District No. 10*, 78 Wash.2d 234, 472 P.2d 539, 540 (1970) (en banc). 1B MOORE, LUCAS & CURRIER, MOORE'S FEDERAL PRACTICE, supra, ¶ 0.404[4.–3] at 131, is consistent with *Vorrath*, stating:

> If an appeal is taken from only a part of the judgment, the remaining part is res judicata, and the vacation of the portion appealed from and remand of the case for further proceedings does not revive the trial court['s] jurisdiction of the unappealed portion of the judgment.

*See also Mad River Boat Trips, Inc. v. Jackson Hole Whitewater, Inc.*, 818 P.2d 1137 (Wyo.1991).

██ Our conclusion that a reversal affects only that portion of the judgment appealed from is tempered by the rule that an appeal from a part of a judgment can be taken only if the appealed portion is severable. In *Buchler v. Buchler*, 65 Wyo. 452, 472, 202 P.2d 670, 678–79 (1949) (quoting *St. Paul Trust Co. v. Kittson*, 84 Minn. 493, 87 N.W. 1012, 1013 (1901)), this Court said:

> "An appeal may be taken from a part of a final order or judgment if the part whereby the appellant is aggrieved is so far distinct and independent that it may be adjudicated on appeal without bringing up for review the entire order or judgment."

*See also Hutchins v. State*, 100 Idaho 661, 603 P.2d 995 (1979) (involving a situation similar to the case at bar). In cases where the appealed judgment is not independent from the remainder, the appeal becomes an appeal from the whole judgment, and, consequently, a reversal will extend to the whole judgment. 5 AM.JUR.2D *Appeal and Error* § 953 (1962). In *Culbertson v. Cizek*, 225 Cal.App.2d 451, 37 Cal.Rptr. 548 (1964), the court offered a helpful test for determining when a part of a judgment is sufficiently independent to be appealed without bringing up the entire judgment:

> "The test of whether a portion of a judgment appealed from is so interwoven with its other provisions as to preclude an independent examination of the part challenged by the appellant is whether the matters or issues embraced therein are the same as, or inter-dependent upon, the matters or issues which have not been attacked. '[I]n order to be severable, and therefore appealable, any determination of the issues so settled by the judgment ... must not affect the determination of the remaining issues whether such judgment on appeal is reversed or affirmed....'"

37 Cal.Rptr. at 559 (quoting *American Enterprise v. Van Winkle*, 39 Cal.2d 210, 246 P.2d 935, 938 (1952) (en banc, citations omitted, and quoting *Attorney General v. Pomeroy*, 93 Utah 426, 73 P.2d 1277, 1294 (1937)).

■ Applying the test of *Culbertson* to the facts of this case, we must determine whether any of the issues which Husman raised on appeal were so interwoven with Count II as to preclude an independent examination. In essence, Count II reflected a disagreement over whether Triton was correct in reducing the amount it owed Husman as a result of the final survey of the material removed or, stated another way: Was the final survey accurate? We do not think that any of the claims which Husman actually appealed, i.e., fraud, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing, were in any way interdependent with Count II.

Of the issues which were appealed, Husman's claim for a breach of the implied covenant of good faith and fair dealing appears to be most closely connected with Count II. However, the only element of the good-faith-and-fair-dealing claim even associated with surveys concerned the contract's $20,000 penalty provision for not removing a minimum volume of topsoil and overburden in any given month. Husman argued in the first appeal that Triton's failure to conduct monthly surveys as required meant that Husman was operating "in the blind" and could not know that it was behind schedule. Apparently, under Husman's theory, if it had realized how much material it was removing, it could have avoided the penalties. In *Husman, Inc.*, we said that the contract was ambiguous as to whether Triton "was only obligated to calculate the volume of material removed after the contract was terminated or was also obligated to conduct surveys during the course of Husman's performance." 809 P.2d at 802. The issue of when surveys were to be conducted related to Husman's claim that the penalty provision was incorrectly applied. Count II's issue concerning whether or not the final survey was accurate as to how much material had been removed was simply not related, much less interdependent.

Similarly, we do not detect any interdependence between Count II and Husman's claims for fraud and negligent misrepresentation. The elements necessary to prove fraud or negligent misrepresentation are clearly independent of Count II. The only plausible way we can conceive of a connection between the issues is if the accuracy of the final survey would be somehow necessary to determine the amount of Husman's damages. However, any damages suffered by Husman for Triton's fraud and negligent misrepresentation were calculated as the difference between the contract price and those out-of-pocket costs incurred which were attributable to Husman's justifiable reliance upon the misrepresentation. The accuracy of the final survey was, therefore, not necessary to determine the amount of damages. Because Husman did not raise Count II as an issue on appeal and it was not interwoven with the issues which were raised, the district court did not have jurisdiction to try the issue upon remand.

■ In the trial below, the question of whether Triton breached the parties' contract was submitted to the jury in a single interrogatory but was argued pursuant to two separate theories: (1) Triton breached the implied covenant of good faith and fair dealing by not conducting monthly surveys; and (2) Count II. Since the trial court did not have jurisdiction to try Count II, the jury's entire breach-of-contract award must be set aside because we cannot determine which theory was the basis for the jury's verdict. *Rosado v. Boston Gas Company*, 27 Mass.App.Ct. 675, 542 N.E.2d 304, 306 (1989). It would appear that the jury relied at least in part upon Count II because the award was for $336,117.23 and the penalty issue involved only $40,000.

■ The trial court's lack of jurisdiction to try Count II meant that the only breach-of-contract issue to be tried was whether or not Husman was wrongfully penalized for failing to meet the contract's production minimum if Triton breached the contract by failing to conduct monthly surveys. Triton maintains that no reason exists to remand the case because the district court should have granted a judgment notwithstanding the verdict on the issue of whether Husman was wrongfully penalized.

When considering the propriety of a J.N.O.V.:

> [W]e undertake a full review of the record without deference to the views of the trial court. In determining whether a JNOV motion should be granted, we consider "whether the evidence is such that without weighing the credibility of the witnesses, or otherwise considering the weight of the evidence, there can be but one conclusion reasonable persons could have reached...." *Erickson v. Magill,* 713 P.2d 1182, 1186 (Wyo.1986). In our review we consider the evidence favorable to the nonmoving party, giving it all reasonable inferences. A court should cautiously and sparingly grant JNOV motions.

*Inter–Mountain Threading, Inc. v. Baker Hughes Tubular Services, Inc.,* 812 P.2d 555, 558–59 (Wyo.1991) (some citations omitted), *quoted in Wilson v. McMahon,* 831 P.2d 1152, 1154 (Wyo.1992).

Applying our standard of review, we conclude that the trial court was correct in not granting a J.N.O.V. in favor of Triton on the remaining breach-of-contract issue. Triton claims that a J.N.O.V. would have been proper because Husman did not prove that any failure to conduct regular surveys caused it to incur penalties in the amount of $40,000. According to Triton, the witness who testified on the issue admitted that the penalties were properly imposed "per the contract" and that Husman knew from its own load count that it was not removing a sufficient volume of material to avoid the penalties. Triton relies upon the following exchange between Husman's attorney and Bob Deurloo, a part owner of Husman as well as a mining engineer, to support its claim:

Q Okay. So your last invoice is for about $246,000 and they say you were overpaid $190,824.76. So, how did they get from there to the $12,000?

A Then [Triton] subtracted $3,561.36 for spare parts which we had used.

Q That's agreeable?

A Yes.

Q I'm just going to continue in this 157–A. So spare parts is not an issue. And that's how much?

A $3,561.36[.]

Q Okay. What other deductions did Triton claim?

A The penalty for August and September of $40,000.

Q Forty?

A Yeah.

Q Anything else?

A No.

Q And so we have to add $190,824.76. So assuming that I can add correctly, you sent in a bill for $246,000 and some, and they said there was $234,000 in credits to Triton, leaving a $12,000 difference.

A Right.

Q Okay. Did you find yourself to be in agreement with any of these figures other than the spare parts?

A The penalty was probably per the terms of the contract, but there were a number of reasons beyond our control, some of them, for not making those yardages those two months. So I think the penalty is a question.

On cross-examination, Mr. Deurloo testified as follows:

Q Now, you had some testimony on Friday about the $40,000 penalties for not meeting production in August and September. Do you recall that?

A Yes. I think it was $20,000 per month.

Q Okay. But you weren't making your production minimum even relying on your load counts, correct?

A In August and September?

Q I mean, the operating in the blind by not knowing the precise adjustment to surveyed volumes didn't affect whether you made those penalties or not because even the volume as you reported it was below the minimum requirements, right?

A It was in August and September.

Q Those are the only months that Triton assessed a penalty for; isn't that right?

A Right.

In our view, Mr. Deurloo's testimony is subject to varying interpretations and is not sufficient to support Triton's claim for a J.N.O.V. Mr. Deurloo did not concede that the penalty was properly imposed but said that it was questionable. The quoted testimony also fails to support Triton's claims that Husman knew it was operating behind schedule and consequently that any failure to conduct monthly surveys did not cause Husman to be improperly penalized. When asked whether Husman knew from its own load count that it was operating below the minimum production requirements, Mr. Deurloo answered: "In August and September?" It is not clear whether he meant that Husman realized it was operating behind schedule or whether he was merely clarifying the months in which the penalties were imposed. A J.N.O.V. is appropriate when reasonable persons could have reached but one conclusion. Reasonable persons could have reached more than one conclusion in this case, and, therefore, we agree with the district court's decision to deny Triton's motion for a J.N.O.V.

■ Triton's only remaining issue which we must consider is whether it was entitled to a directed verdict on Husman's claim of negligent misrepresentation because the saturated condition of the material to be removed was so obvious. Triton relies upon *Appeal of Fox*, AGBCA No. 76–139–4, 1980 WL 2372 (Ag.B.C.A. Nov. 14, 1980), for the proposition that a contractor is responsible for expenses associated with site conditions when the conditions are obvious, even if the site's owner misrepresents the conditions. To support its contention that the saturated condition of the overburden was obvious, Triton cites to a long list of witnesses who testified that the material was obviously wet, as well as photographs taken by Husman's own Mr. Deurloo showing water in the area where Husman would be working.

Our standard of review for considering a directed verdict is virtually the same standard as used for considering a J.N.O.V. *Cody v. Atkins*, 658 P.2d 59 (Wyo.1983). Although Triton presented a strong case at trial that the water was obvious, sufficient evidence existed such that a reasonable person could have concluded that the saturated condition of the material was not so apparent. Husman presented the jury with testimony from Doug Emme, an engineer with considerable knowledge about coal mines. Mr. Emme testified that, after visiting the mine, his impression of the material to be removed was that it was "potato dirt" which, in his words, meant: "Loose, sandy material that you can move easily. It doesn't have a lot of water in it.... It would be good garden material to grow carrots, potatoes—things like that." Ralph Stark, who helped assemble the bid for another contractor, also testified: "[I]t appeared to be a job that was what we would refer to as a good dirt job, a job that you would get a good scraper filled with minimum amount of effort, a short haul, and a good dump, the material is not going to be sticky and so forth." Mr. Stark testified that he expected the mine, like all mines, to have some water but that he bid it as a dry dirt job. Mr. Stark visited the mine after Husman won the bid to observe the operation and was "amazed" at the amount of water and mud. In our estimation, the foregoing testimony was sufficient to support a conclusion that the moisture was not obvious.

In Case No. 92–56, Husman raises the following issues in its cross-appeal:

1. Did the District Court err in refusing to instruct the jury on Plaintiff's total cost theory of damages?

2. Did Plaintiff have the burden to prove its damages to a reasonable degree of certainty?

3. Did the District Court err in entering a judgment for a setoff in an unspecified amount where Defendant did not allege or offer evidence in support of a counterclaim?

If we correctly understand Husman's position, its first two issues on cross-appeal are raised in the event that we remand the case for a new trial on its negligent-misrepresentation claim in Case No. 92–55. Since we are affirming the negligent-misrepresentation award in Case No. 92–55 and are remanding for a new trial on the narrow

issue of whether Triton improperly imposed the monthly penalty provisions, we do not need to consider Husman's first two issues in Case No. 92–56.

■ Husman's final claim of error in its cross-appeal is that the district court's judgment improperly ordered Triton to deduct any amount from the judgment which it paid directly to Husman's creditors. Triton's right to pay Husman's creditors was initially decided in the summary-judgment order when the district court found that Husman was "entitled to judgment on the retainage Triton has admitted exists in the amount of $33,525.34, subject to Triton's right under the Contract and Wyoming law to continue holding this retainage for possible application against pending lien claims." After the jury awarded $336,-117.23 to Husman for breach-of-contract damages, the trial court ordered that $33,-525.34 be deducted from the award. The trial judge assumed that the jury's award included the $33,525.34 and that Triton had already paid that amount to Husman's creditors, so he ordered the deduction to avoid making Triton pay twice. Husman's counsel agreed with this arrangement, saying: "These claims have been filed in the bankruptcy proceeding and could we make it so that if they have actually paid out the thirty-three, they get credit for it?" However, on appeal, Husman argues that Triton's claim was a setoff which had to be pleaded as a compulsory counterclaim pursuant to W.R.C.P. 13(a)[2] and that, since Triton pleaded it as an affirmative defense, the claim was barred.

Triton counters, citing *Lukens v. Goit,* 430 P.2d 607, 610–11 (Wyo.1967), that its right to use the retainage to pay lien claimants was a "recoupment defense" rather than a setoff and was, therefore, properly pleaded as a defense and not as a counterclaim. Subsequent to our decision in *Lukens,* this Court said: "Under Rule 13, there is no general difference for purposes of pleading between setoff, recoupment, or independent claims in the sense that they all constitute counterclaims." *Hawkeye–*

*Security Insurance Co. v. Apodaca,* 524 P.2d 874, 879 (Wyo.1974). *See also Mad River Boat Trips, Inc.,* 818 P.2d 1137. We do not think that *Hawkeye–Security Insurance Co.* meant to foreclose a party from pleading recoupment as a defense but instead demonstrated the strong similarity between the three responses. However, even if Triton's claim should have been pleaded as a counterclaim rather than as a defense, it was not fatal. W.R.C.P. 8(c)[3] provided in part:

> When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

In discussing F.R.C.P. 8(c), which is identical to W.R.C.P. 8(c), Professors Wright and Miller state:

> Inasmuch as it is not clear whether setoffs and recoupments should be viewed as defenses or counterclaims, the courts, by invoking the misdesignation provision in Rule 8(c), should treat matter of this type as if it had been properly designated by defendant, and should not penalize improper labelling.

5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1275 at 459–60 (1990). On the facts of this case, it is less than clear whether Triton should have pleaded its claim as a defense or as a counterclaim. Triton should not now be penalized for choosing to plead its claim as a defense. Husman had ample notice of Triton's claim and even agreed in a post-trial-directed-verdict hearing that $33,525.34 should be deducted if Triton had in fact paid the creditors. Our decision that Triton's pleading was valid is consistent with the interests of justice as well as the liberality with which we construe pleadings.

Husman also claims that Triton failed to introduce any evidence showing that it actually paid any of Husman's creditors and, if it did pay any creditors, what amounts were paid. Triton's response is that Hus-

---

**2.** Revised effective March 24, 1992.

**3.** *Id.*

man is currently in a Chapter 11 bankruptcy proceeding and that the bankruptcy court is the proper forum for resolving all accounting issues. We agree that the amounts which were paid, and to · what creditors, should be determined in the bankruptcy proceeding.

■ Triton's pleading was valid, and whether Triton has actually paid the full $33,525.34 to Husman's creditors must be determined in the bankruptcy proceeding. However, $33,525.34 should not be deducted from the judgment as it stands after our decision that the district court did not have jurisdiction to try Count II. The district judge allowed $33,525.34 to be deducted from the judgment because the $336,-117.23–breach–of–contract award included that amount and the judge did not want Triton to pay the retainage twice. Since we have reversed the breach-of-contract award and only the negligent misrepresentation award remains, $33,525.34 should not be deducted from that amount. The only remaining questions concerning the $33,525.34 are whether Triton actually paid Husman's creditors and, if so, in what amounts. Those determinations can be made in the bankruptcy proceeding.

In summary, we affirm the jury's verdict for negligent misrepresentation, and we reverse the breach-of-contract award. We remand for the district court to determine whether Triton was required to conduct monthly surveys of the material removed and, if so, whether Triton wrongfully imposed the contract's $20,000 penalty provisions for the months of August and September.

CARDINE, Justice, dissenting, with whom THOMAS, Justice, joins.

Husman sued Triton Coal Company to recover loss and damage resulting from breach of contract because of Triton's failure to pay for overburden moved and for negligent misrepresentation of soil and water conditions which caused Husman to enter into the contract causing damage. On July 9, 1990, the trial court entered summary judgment in favor of Triton and against Husman, stating:

> [T]he Court finds that there are no genuine issues as to any material fact and the Defendant [Triton] is entitled to Judgment as a matter of law on all claims asserted by the Plaintiff.

On July 11, 1990, Husman filed its notice of appeal to the supreme court which states:

> hereby appeals to the Supreme Court of the State of Wyoming from the Judgment and Order entered herein on July 9, 1990.

The judgment did not rule separately upon the claims asserted by Husman but entered a general judgment against Husman upon the entire case. The appeal was from the total summary judgment. The supreme court reversed and remanded, stating in its mandate as follows:

> The Court being now fully apprised in the matter, does say and find there is reversible error in the record of the proceedings of the District Court of Sheridan County.
>
> It is therefore ordered and adjudged for the reasons stated in the opinion herein this day delivered and filed that *the judgment of the District Court be, and the same hereby is, reversed....* [emphasis added]

On June 14, 1991, the district court entered an order vacating and setting aside the judgment which stated as follows:

> It is, therefore, ORDERED AND ADJUDGED that *the judgment and order* of this Court dated and filed July 9, 1990, *be vacated and set aside* and the above entitled action shall be set for trial before a jury of twelve persons at a time convenient to the Court and counsel. [emphasis added]

The issue here presented for our determination is:

> Where there has been no live witness testimony, no determination of ·credibility, no introduction of exhibits or evidence, no trial to a court or jury resulting in final judgment, but instead a preliminary disposition by summary judgment in a very complex, difficult case, must an appellant, from that total judg-

ment, brief and present argument on every disputed issue of fact, every claim, and every theory to preserve it for trial, or is it sufficient to demonstrate disputed issues of fact or incorrect application of law to entitle the losing party to a reversal, remand, and opportunity to try his case?

I see a very great difference between the appeal of a case disposed of upon motion before trial and appeal of a case in which final judgment has been entered after a trial upon the merits in which there was a full opportunity to present all of the facts and evidence for decision. Making this distinction, the result in cases cited by the parties is understandable. Thus, in *Roberts Const. Co. v. Vondriska*, 547 P.2d 1171, 1178 (Wyo.1976), there was a trial (not a preliminary disposition), final judgment, and appeal. The appeal was sufficient to raise the issue of the order to restore a gate, but appellant chose not to brief or argue that issue. It was held that Roberts waived any claim that he should not be required to restore the gate. The order to restore in the final judgment was clear; it had been fully resolved by trial; appellant did not contest it. Appellant was on notice of the requirement and obviously intended not to contest but to comply. In this case there is no specific order or notice of a penalty or loss of a right; no final judgment after trial determining all questions, liability and damages; and no clear statement of impending loss of right to present its entire case in a trial upon reversal.

Likewise, the decision in *Potter v. Gilkey*, 570 P.2d 449 (Wyo.1977), is not authority for the court's decision here for it was reversal of a judgment *after trial* and remand for a specific purpose. We said:

Here the finding of assignment was improper because the trial court had no authority to try any issues other than those directed by the former mandate and opinion or any that were necessary to reach a decision on the mandated issues and which had not already been decided.

570 P.2d at 454. Remand in the instant case was not for a specific purpose but from reversal of a general judgment upon the entire case.

First, I would hold that the trial court correctly tried the entire case to the jury because:

This was and is a plain unqualified reversal. To reverse a judgment or order means to overthrow it by a contrary decision, to make it void. When a judgment or order is reversed it is as if never rendered or made. *Raun v. Reynolds*, 18 Cal. 275, 276, at page 290.

*Central Montana Stockyards v. Fraser*, 133 Mont. 168, 320 P.2d 981, 991 (1957). *See also* 5B C.J.S. *Appeal & Error* § 1950, p. 511 (1958). Thus, the entire case was remanded for trial, and the trial court correctly ruled that the entire case should be tried to a jury.

The second reason this entire case was properly tried to the jury is that this was a suit upon a contract and nothing more. Claims were asserted of negligence and misrepresentation in making the contract, in breach for failure to determine quantities of overburden moved and damages for failure to pay for overburden moved and for assessing penalties under the contract; but the entire case concerned the contract of the parties. Thus, it is well stated that:

This appeal is not a multi-party multiclaim action, but a single claim between two parties. "The word 'claim' in Rule 54(b) refers to a set of facts giving rise to legal rights in the claimant, not to legal theories of recovery based upon those facts." Where "each count sets forth a different legal theory, but each is based on the same transactions as evidenced in the contract and deed," there is but one claim. [citations omitted]

*Hutchins v. State*, 100 Idaho 661, 603 P.2d 995, 1001 (1979). And so, in reality, there is here but one claim. The contract is at the center of the controversy, and all claims should have been and were tried to the jury upon remand.

In its appeal of the entry of summary judgment to the supreme court, appellant raised as an issue and argued the negligent

misrepresentation claim contending that there were disputed issues of material fact which required reversal as a matter of law. The basis for this court's opinion is that Husman should also, on appeal of summary judgment, have briefed and argued the breach of contract damage for overburden excavated and hauled.

The result of the court's decision in this case will require an appellant from a summary judgment to present to the court, on appeal, issues and argument upon every fact in the case, every claim, every theory, or suffer the consequences of waiver in a case that was never tried. We should not mandate this result for cases in which there has been a preliminary disposition by entry of judgment before there has ever been a witness called, testimony taken, credibility judged, disputed issues of fact developed and resolved, and a final judgment after trial by a court or jury.

Finally, although I do not believe it necessary, I would, at a minimum, hold that this court, in the interest of effecting substantial justice in this case, affirm the decision of the district judge in ordering trial of this entire case to the jury in accordance with our statement on rehearing of *Wyuta Cattle Co. v. Connell*, 43 Wyo. 135, 299 P. 279, *reh'g denied* 43 Wyo. 152, 155, 3 P.2d 101, 103 (1931), *quoting King Solomon Tunnel & Dev. Co. v. Mary Verna Mining Co.*, 22 Colo.App. 528, 127 P. 129, 131 (1912):

> Appellee also invokes the well-established general rule that appellate courts will not consider errors assigned, but not discussed in the printed briefs or on oral argument. Notwithstanding these general rules, we do not think they are at all times and under all circumstances inflexible. The appellate courts may in their discretion, and sometimes do, disregard the same, in order to prevent a miscarriage of justice. We think the substantial rights of litigants are of greater weight than the inadvertence or omissions of their attorneys. We are satisfied that the record here justifies the court in considering the same in formulating its opinion, although the rule may have been disregarded by appellant. We

will concede that appellant failed, both in its printed brief and on oral argument, to discuss the eighth assignment of error next thereinafter mentioned. [citations omitted]

Assuming it were necessary for Husman to present the breach of contract issue upon the penalty waiver, I would disregard the failure and affirm the decision of the trial court to try the entire case to the jury. Were this case disposed of per my dissent, I would also recognize that Husman should not recover more than that claimed for breach of contract, or $247,000, and would reduce the judgment accordingly or remand to resolve this damage question.

THOMAS, Justice, dissenting.

I, too, must dissent in this case. I agree with Justice Cardine and join in his dissenting opinion. I particularly agree with his discussion of the distinguishing characteristics between the cases relied upon by the majority which refer to the appellate effect of the reversal following a trial on the merits and those of a summary judgment issued by the court before a trial. I simply add to what he says in distinguishing Wyoming precedent that *Vorrath v. Garrelts*, 49 Mich.App. 142, 211 N.W.2d 536 (1973), *Tom Beuchler Construction, Inc. v. City of Williston*, 413 N.W.2d 336 (N.D.1987), and *Calistro v. Spokane Valley Irrigation Dist. No. 10*, 78 Wash.2d 234, 472 P.2d 539 (1970), likewise are distinguishable because none of these cases involves a summary judgment. *Lang v. Federated Dep't Stores, Inc.*, 161 Ga.App. 760, 287 S.E.2d 729 (1982), speaks specifically to a "cause of action" not an issue or a theory. I also agree with Justice Cardine that the contract is at the center of the controversy making the issues so interwoven that all claims were properly tried to the jury upon remand. *Hutchins v. State*, 100 Idaho 661, 603 P.2d 995 (1979).

In listing the issues in *Husman, Inc. v. Triton Coal Co.*, 809 P.2d 796, 798 (Wyo. 1991), we included this one:

> Whether genuine issues of material fact exist as to whether [Triton Coal]

breached the contract and its covenant of good faith and fair dealing.

In our opinion in *Husman*, we did not specifically address any breach of contract issue. Instead, we discussed only the issue of the breach of a covenant of good faith and fair dealing, saying:

We hold that the contract term requiring a volume calculation is ambiguous. *See True Oil Company v. Sinclair Oil Corporation*, 771 P.2d 781 (Wyo.1989) (whether a contract is ambiguous is a question of law). Consequently, summary judgment is inappropriate, and the matter is remanded to the district court for determination of whether Triton Coal was only obligated to calculate the volume of material removed after the contract was terminated or was also obligated to conduct surveys during the course of Husman's performance. *See Carlson v. Carlson*, 775 P.2d 478 (Wyo.1989).

*Husman*, 809 P.2d at 802.

I cannot perceive this as a limitation upon the authority of the trial court to try the issue of breach of contract after the summary judgment was reversed.

In *Husman*, this Court reversed the trial court's decision and remanded the case after finding genuine issues of material fact existed concerning Husman's claims of fraud, negligent misrepresentation, and breach of the covenant of good faith and fair dealing. In my view, the effect of the reversal of the summary judgment was to nullify that judgment completely and to leave the case in the posture as if such judgment had never been rendered. *See In re General Adjudication of All Rights to Use Water in the Big Horn River System*, 803 P.2d 61 (Wyo.1990) (holding that when interlocutory ruling of trial court is reversed, case is returned to trial court and continues as though erroneous ruling had not been made).

On remand, the lower court permitted Husman to try not only its tort claims and its claim for a breach of the implied covenant of good faith and fair dealing, but also Count II. Count II was the breach of contract claim for the material removed for which Triton did not pay. It was an alternative theory to the claim for a breach of the implied covenant of good faith and fair dealing. Triton objected to trying Count II, arguing the issue had been disposed of by the trial court's granting of a summary judgment and by Husman's failure to raise the issue on appeal. The trial judge denied Triton's motion. This was the prerogative of the trial court. The judge correctly construed our opinion in Husman as requiring trial of the whole case, including Count II. I not only would affirm the jury verdict for Triton's negligent misrepresentation of the site conditions, as the majority does, but I would also affirm the jury verdict for Triton's breach of contract.

Triton argues Husman was foreclosed from pursuing Count II because that issue became the "law of the case," and Husman's failure to appeal Count II rendered the trial court's summary judgment final pursuant to the doctrine of waiver. *See* Majority at 667. After an in-depth review of the doctrines of law of the case and waiver, the majority proceeds to explain "why we think that the 'law of the case' as applied in this type of case is simply an example of waiver". Majority at 667. I disagree with the majority's conclusion that an appellate court's reversal of a summary judgment affects only that portion of the judgment from which an appeal actually is taken. It is important to note this language from 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478, at 789–90 (1981) (footnote omitted):

Although courts are often eager to avoid reconsideration of questions once decided in the same proceeding, it is clear that all federal courts retain power to reconsider if they wish. Law of the case principles in this aspect are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards. In one classic statement, Justice Holmes noted that law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."

The applicable rule is stated in 5B C.J.S. *Appeal and Error* § 1950 (1958) (footnote omitted)[1]:

> The effect of a general and unqualified reversal of a judgment, order, or decree is to nullify it completely and to leave the case standing as if such judgment, order, or decree had never been rendered, except as restricted by the opinion of the appellate court.

The majority recognizes this general rule, agrees with it, and points out that a *large number* of jurisdictions around the country follow this rule. However, the majority then finds such a rule does not mean our reversal in the first appeal granted the district court jurisdiction to try Count II in this case. *See* Majority at 668. I am satisfied this holding is erroneous.

The issues are open following a complete reversal, except as qualified by the appellate court. This general principle is found at 5 AM.JUR.2D *Appeal and Error* § 992 (1962):

> On remand, the trial court may consider and decide any matters left open by the appellate court and is free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not presented or settled by such decision. The issues are generally open on a retrial when a case is reversed and remanded for further proceedings. If the mandate speaks only in the light of the special facts found, the lower court is at liberty to proceed in all other respects in the manner that, according to its judgment, justice may require.

The Mandate on Reversal in this case provided:

> This cause having been heretofore taken under advisement, the court, being now fully apprised in the matter, does say and find there is reversible error in the record of the proceedings of the District Court of Sheridan County.
>
> It is therefore ordered and adjudged for the reasons stated in the opinion herein this day delivered and filed that the judgment of the said district court be, and the same hereby is, reversed, and the case is remanded for proceedings consistent with the opinion.

Husman was not foreclosed from pursuing Count II at the subsequent trial, even if Husman had failed to appeal the summary judgment against it on that issue.

I find two cases controlling on this issue, one cited by both parties in their briefs, and one that neither cited. The cases are, *Hutchins v. State,* 100 Idaho 661, 603 P.2d 995 (1979), and more recently, *Zavarelli v. Might,* 239 Mont. 120, 779 P.2d 489 (1989).

In *Hutchins,* the Supreme Court of Idaho was considering an action for a second time, as in the case at hand. The Supreme Court initially had reversed a summary judgment entered against the State and remanded the case for further proceedings. Hutchins had not appealed from that aspect of the summary judgment entered in favor of the State. In the second appeal, the Supreme Court of Idaho agreed with the district court saying:

> [A]ll issues not passed upon by this Court were open to him at the second trial. After a general reversal, a trial court is free to correct any error in its original findings and conclusions *as to matters not passed on by the appellate court.*

*Hutchins,* 603 P.2d at 1000 (citations omitted).

When the trial court's decision is reversed, the judgment is no longer final, and the trial court may correct an error in its original findings as to a matter not passed on by the appellate court. The trial court continues to have jurisdiction, regardless of whether a claim is specifically brought on appeal or not. This is exactly what happened in this case. Even if Husman had not raised Count II specifically, that would not mean jurisdiction was lost to the trial court. Just the contrary occurs. The reversal of summary judgment on one or more counts implicitly reverses on all other counts. Thus, it was proper for the trial

---

1. "The reversal sets the matter at large for readjudication of all issues involved in the case, * * *." 5 AM.JUR.2D *Appeal and Error* § 955 (1962).

judge to allow the jury to consider Count II in the case at hand.

In *Zavarelli*, the district court's issuance of a permanent injunction was appealed. The Supreme Court of Montana reversed and remanded the case. After remand, the district court's ruling was again appealed. The Supreme Court held that, on reversal and remand, the district court was reinvested with full jurisdiction for further proceedings. Specifically, the court stated:

> When this Court reversed the first judgment of the District Court as to a prescriptive easement, and remanded the cause to the District Court for further proceedings, the cause was then before the District Court in the posture of not having a final judgment. In that situation, when there is nothing in the terms of the mandate to prevent it, the trial court has the power, on reconsideration, to find the same facts and change its holding, or to find different facts consistent with its original holding. *Imperial Chemical Industries Ltd. v. National Distillers and Chemical Corp.* (2d Cir. New York 1965), 354 F.2d 459, 19 A.L.R.3d 492.

*Zavarelli*, 779 P.2d at 493.

This is precisely the situation in this case. On remand, the case was in the posture of not having a final judgment, thus, neither the doctrine of law of the case nor the doctrine of waiver applies. A careful reading of the opinion and mandate in this case illustrates there is nothing to prevent the trial court from having full jurisdiction to hear all of the claims, regardless of whether they were raised specifically or not.

I would hold Count II was properly considered by the jury, and I would affirm the jury verdict in its entirety.